J-S17017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | No. 3017 EDA 2023 |

Appeal from the Order Entered November 8, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000589-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | No. 3018 EDA 2023 |

Appeal from the Decree Entered November 2, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000175-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | No. 3019 EDA 2023 |

Appeal from the Order Entered December 1, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000590-2020

J-S17017-24

IN THE INTEREST OF: J.P., A MINOR  :  IN THE SUPERIOR COURT OF
                                            :            PENNSYLVANIA
                                            :
                                            :
                                            :
                                            :
                                            :
                                            :
                                            :
APPEAL OF: J.P., FATHER            :     No. 3020 EDA 2023

Appeal from the Decree Entered November 2, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000176-2023

BEFORE:  BOWES, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:           **FILED AUGUST 6, 2024**

Appellant, J.P. ("Father"), appeals from the orders and decrees[1] entered in the Philadelphia County Court of Common Pleas, changing the permanency goals to adoption and involuntarily terminating his parental rights to Jo.P. and Ja.P. (who are twins, born in May 2014) ("Children").[2]  We affirm.

In its opinion, the trial court accurately set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.[3]  (**See** Trial Court Opinion, filed 2/13/24, at 2-13).

_____

[1] This Court consolidated the appeals *sua sponte*.

[2] The court also changed the permanency goals and terminated the parental rights of Children's mother, J.G. ("Mother").

[3] On June 18, 2024, this Court vacated orders denying Mother's petitions to appeal *nunc pro tunc* from the orders changing the permanency goals to adoption and terminating her parental rights to Children and another child, A.G.  **See Interest of A.G.**, Nos. 574 EDA 2024, 575 EDA 2024, 576 EDA 2024, 577 EDA 2024, 578 EDA 2024, & 579 EDA 2024 (Pa.Super. filed June
*(Footnote Continued Next Page)*

- 2 -

Father raises two issues for our review:

> 1. Whether the Trial Court erred by terminating the parental rights of Appellant, Father, under 23 Pa.C.S.A. § 2511 subsections (a)(1), (a)(2), (a)(5) and (a)(8)?
>
> 2. Whether the Trial Court erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Father's] parental rights best serves the Children's developmental, physical and emotional needs and welfare?

(Father's Brief at 4).

After a thorough review of the record, the briefs of the parties, and the applicable law, we conclude that Father's issues merit no relief based on the reasoning set forth in the trial court's well-reasoned opinion. (*See* Trial Court Opinion at 14-22). Specifically, the trial court noted that Father has not

_____

28, 2024) (unpublished memorandum). In doing so, this Court explained that our review of the docket entries revealed a breakdown in the operations of the court concerning entry of the goal change and termination orders, where none of the docket entries concerning those orders expressly stated that Pa.R.C.P. 236 notice had been provided. Thus, we remanded for further proceedings and directed the clerk of courts to re-enter the termination/goal change orders with appropriate notice per Rule 236, after which Mother could timely appeal within 30 days. *See id.* Notwithstanding the similar lack of express Rule 236 notice on the docket entries concerning the goal change and termination orders in Father's case, there is no need to vacate and remand in this case where Father filed his appeals within 30 days of the relevant orders and the trial court had an opportunity to address the claims he sought to raise on appeal in its Rule 1925(a) opinion. *See Davis v. Lynwood*, No. 112 MDA 2022 (Pa.Super. filed Sept. 23, 2022) (unpublished memorandum) (noting that appeal period does not begin to run until entry of Rule 236 notice on docket; explaining that failure to provide Rule 236 notice constitutes breakdown in operations of court; nevertheless, we may regard as done which ought to have been done and reach merits of appeal). *See also* Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

cooperated with the Community Umbrella Agency ("CUA") throughout the life of the case. Father "expended most of his energy fighting with [the caseworker], his attorney, and the [c]ourt rather than making a legitimate effort to achieve his [single case plan ("SCP")] objectives and reunification with his children." (*Id.* at 16). The court explained that Father's SCP objectives were to avail himself to the caseworker on a bi-weekly basis, sign all necessary consent documents, attend court-ordered visitation with Children, obtain stable housing, comply with mental health treatment, and enroll in drug and alcohol treatment and anger management counseling. Father did not comply, or only minimally complied, with these objectives.

Notably, Father failed to sign documents granting the agencies and service providers permission to share information with CUA so that CUA and the court could monitor Father's progress, and he would not even sign a document acknowledging receipt of his SCP objectives. Further, Father failed to provide the caseworker with a copy of the lease of his home or with bills for utilities or other proof of housing. The caseworker could not confirm whether Father was receiving mental health treatment based on Father's refusal to sign the consent to give CUA the authority to receive information about his mental health treatment.

Although Father tested negative on one drug screen, there was a concern the test was tampered with. The caseworker could not confirm whether Father continued with drug and alcohol treatment because he refused

to sign the necessary consent forms. Father did not provide the CUA with any proof of attending anger management classes. Father claimed the program was full, but the program reported that it had availability for Father.

Father's visits with Children were "problematic and concerning." (***Id.*** at 18). There was a concern that Father was under the influence during some visits. The caseworker indicated that Children display fear when they are around Father. The caseworker described Father as lacking enough patience with Children. The caseworker also stated that Father has used physical contact with Children.

Children have resided with their paternal aunt and uncle for over two years. Jo.P. is doing "extremely well" in the home. (***Id.*** at 19). Jo.P. looks to his caregivers to meet his needs. Jo.P. does not want to visit with Father because Father screams at him. Ja.P. has autism and shares a parent-child relationship with his caregivers. Ja.P.'s aunt is a special education teacher and is very patient with him. Ja.P. looks to his paternal aunt and uncle to meet his needs.

The caseworker explained that Father has never reached out to inquire how Children were doing in paternal aunt and uncle's home. Father has not asked about Ja.P.'s medical or educational needs and he does not send Children gifts. The caseworker confirmed that neither child shares a bond with Father, and she did not believe that Children would suffer any irreparable harm if the court terminated Father's parental rights. The court credited

testimony from the caseworker. Children's legal counsel further confirmed that Children do not want to visit with Father and want to be adopted by paternal aunt and uncle.[4]

Our review of the record support's the court's involuntary termination of Father's parental rights under Section 2511(a)(2) and (b).[5] Therefore, we agree that termination of Father's parental rights was proper.[6] Accordingly, we affirm based on the trial court's opinion.

Orders and decrees affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/6/2024

_____

[4] Children's guardian *ad litem* agreed that Children's best interests would be served by terminating Father's parental rights and allowing Children to be adopted by their paternal aunt and uncle. (**See** N.T. Termination Hearing, 11/2/23, at 64).

[5] The trial court concluded that termination of Father's parental rights was proper under Sections 2511(a)(1), (2), (5), (8), and (b). "We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." **In re B.J.Z.**, 207 A.3d 914, 922 (Pa.Super. 2019). Thus, we need not evaluate the court's findings under Sections 2511(a)(1), (5), and (8).

[6] Although Father also appealed from the goal change orders, he has abandoned any challenge to the goal change orders on appeal. In any event, based on our disposition, any challenge to the goal change orders is moot. **See Interest of D.R.-W.**, 227 A.3d 905 (Pa.Super. 2020).

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA COUNTY COURT OF COMMON PLEAS**
**FAMILY COURT DIVISION**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | CP-51-AP-0000175-2023 |
| J.P. | : | CP-51-DP-0000589-2020 |
| | : | No. 3018 & 3017 EDA 2023 |
| | : | |
| IN THE INTEREST OF: | : | CP-51-AP-0000176-2023 |
| J.P. | : | CP-51-DP-0000590-2020 |
| | : | No. 3020 & 3019 EDA 2023 |
| | : | |
| APPEAL OF J.P. | : | FID: 51-FN-002621-2012 |
| | : | |

FILED IN SUPERIOR COURT
FEB 1 5 2024
EASTERN DISTRICT

## OPINION

### PROCEDURAL HISTORY

The trial court held a multi-day hearing on the Petitions to Terminate the Parental Rights of J.P., the biological father ("Father") and J.G., the biological mother ("Mother"), of J.P. (hereinafter Jo.P.), (D.O.B. May ___, 2014) and J.P. (hereinafter Ja.P.), (D.O.B. May ___, 2014). The dates on which the hearing occurred were July 6, 2023 and November 2, 2023. Father was present and represented by counsel at each date. The Children were represented by a Child Advocate. At the conclusion of the hearing, the trial court found clear and convincing evidence to involuntarily terminate the parental rights of Mother and Father based upon their inability to remedy the conditions that brought the Children into care and to change the goal of the Children to adoption pursuant to 23 Pa. C.S.A. § 2511(a)(1)(2)(5)(8) and 23 Pa.C.S.A. § 2511(b). The Notices of Appeal were filed by Father on November 30, 2023. Mother filed a "Petition to Leave to File Appeal Nunc Pro Tunc" on December 14, 2023 which this court denied on January 24, 2024.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Father's Statements of Matters Complained of on Appeal for CP-51-AP-0000175-2023 and CP-51-AP-0000176-2023 are identical and set forth below:

1. The evidence was insufficient for the Court to find, by clear and convincing evidence, to terminate Father's Parental Rights.

2. The evidence was insufficient for the Court to find, by clear and convincing evidence, that terminating Father's parental rights best serves the Child's physical and emotional needs and welfare under 2511(b).

Father's Statements of Matters Complained of on Appeal for CP-51-DP-0000589-2020 and CP-51-DP-0000590-2020 are identical and set forth below:

1. The evidence was insufficient for the Court to find, by clear and convincing evidence, to change the goal to adoption under 2511(a).

2. The evidence was insufficient for the Court to find, by clear and convincing evidence, that changing the goal to adoption best serves the Child's physical and emotional needs and welfare under 2511(b).

### FINDINGS OF FACT PRIOR TO THE FILING OF THE PETITION FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS

On January 4, 2019, DHS received a General Protective Services (GPS) report alleging that the Philadelphia Police were dispatched to the family's home pursuant to a domestic dispute between the children's mother, J.G, and her paramour; that the police observed that Mother and her paramour were visibly intoxicated and appeared to be under the influence of alcohol and narcotics; that Mother had six unidentified children in the home; that Mother was unable to provide a safety resource for the children; and that the police would remain at the home. This report was

determined to be valid. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "b", filed 5/3/2023).

On June 3, 2020, DHS received a GPS report alleging that Jo.P. and Ja.P. were observed sitting on top of home's refrigerator and banging on a window; that the children were believed to be in the home without adult supervision; that the Philadelphia Police were contacted but failed to arrive on the scene; that Mother subsequently returned home; that Mother might use drugs; and that the lack of supervision was ongoing. This report was determined to be valid. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "c", filed 5/3/2023).

On June 4, 2020, DHS went to the family's home. Six-year-old Jo.P. answered the door and stated that Mother was not at home, but that nine-year old A.G. was present. A.G. came to the door and stated that he did not know Mother's whereabouts; that he was uncertain for how long she had been gone; and that they had been left unsupervised. A.G. brought a cellular telephone to the door but stated that he did not know Mother's telephone number. A.G. attempted to contact relatives via telephone, without success. A neighbor subsequently presented to DHS and attempted to reach Mother via telephone for approximately 30 minutes before making contact. DHS spoke with Mother and advised her that DHS was at the home and that the children were unsupervised. Mother was belligerent and used profanity, and DHS noted that her speech was slurred. Mother stated that she would return to the home. DHS observed that six-year- old Ja.P. was clothed in a diaper only. Ja.P. then exited the home and ran into the street. DHS had to stop an oncoming vehicle to prevent Ja.P. from being hit. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "d", filed 5/3/2023).

Approximately 45 minutes after DHS arrived at the home, Mother returned. Mother stated to DHS that she was going to contact the police; that she had been attempting to contact the landlord to address a plumbing issue with the home's toilet; and she Instructed A.G. to go upstairs and flush the toilet. DHS observed that water from the toilet was running from the ceiling into the kitchen and onto the refrigerator. Mother continued to display erratic behavior, which fluctuated between aggressive speech and behavior and uncontrollable crying. DHS asked Mother if there were any relatives who would be willing to care for the children. Mother contacted the children's maternal grandmother, who stated that she was employed, that she was unable to care for the children, and that there were no other family members willing and able to care for A.G., Jo.P., and Ja.P.. Mother stated that she did not have any friends or neighbors who could care for the children and that the children could not reside with their respective fathers. DHS advised Mother that the children could not remain in the home and Mother evicted DHS from the home. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "e", filed 5/3/2023).

On June 4, 2020, DHS obtained an Order of Protective Custody (OPC) for A.G., Jo.P., and Ja.P. and placed them with police assistance in a First Choice foster home. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "f", filed 5/3/2023). At the shelter care hearing held for A.G., Jo.P., and Ja.P. on June 5, 2020, the Court lifted the OPC and ordered the temporary commitment to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "g", filed 5/3/2023).

On June 23, 2020, the Community Umbrella Agency (CUA) Northeast Treatment Center (NET) held a Single Case Planning (SCP) Meeting. Mother participated via telephone and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with

a dual diagnosis program; sign all necessary release of information documents (ROI); cooperate with CUA; comply with the Achieving Reunification Center (ARC); and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; and visit as allowed by the court order. The SCP goal for A.G., Jo.P., and Ja.P. was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "h", filed 5/3/2023).

On July 8, 2020, an adjudicatory hearing was scheduled before the Honorable Deborah Canty. The hearing was continued due to no Judge sitting. It was ordered that the adjudication was deferred and all prior orders were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "i", filed 5/3/2023).

On July 14, 2020, an adjudicatory hearing was held before of the Honorable Vincent W. Furlong. The hearing was continued due to counsel being appointed for Father at the bar of the court. The Court further ordered the temporary commitment to stand; and adjudication was deferred. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "j", filed 5/3/2023).

On July 29, 2020, an adjudicatory hearing was held before the Honorable Deborah Canty. The hearing was continued so that all the siblings' cases could be joined. The Court further ordered the temporary commitment was to stand; and the adjudication was deferred.

On August 20, 2020, an adjudicatory hearing was held before the Honorable Vincent W. Furlong. The hearing was continued for further investigation. The Court ordered the temporary commitment to stand; and adjudication was deferred. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "k", filed 5/3/2023).

On August 20, 2020, an adjudicatory hearing was held regarding A.G. The Honorable Vincent W. Furlong adjudicated A.G. dependent and found that A.G. was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.[1] The Court ordered A.G. was to be fully committed to DHS. The Court further ordered that Mother was to be referred to the Clinical Evaluation Unit (CEU) for a dual diagnosis assessment and three random drug screens when the CEU resumed operations. The Court also ordered that Mother was to have supervised visits with A.G. at the agency. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "m", filed 5/3/2023).

On September 16, 2020, an adjudicatory hearing was held before the Honorable Vincent W. Furlong. The hearing was continued. The Court ordered the temporary commitment to stand; and the adjudication was deferred. The Court also ordered that Mother and Father were to be referred to Behavioral Health Services (BHS) for consultation/evaluation; and Father was to be referred to CEU for an assessment. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "n", filed 5/3/2023).

On November 9, 2020, an adjudicatory hearing was scheduled before the Honorable Vincent W. Furlong. The hearing was continued for further investigation. The Court ordered the temporary commitment to stand; and the adjudication was deferred. The Court also ordered that Mother and Father could have joint visits if there was no conflict. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "o", filed 5/3/2023).

On December 10, 2020, the CUA NET held a SCP Meeting. Mother and father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual

---

[1] Only the adjudicatory hearing for A.G. was held on this date. The adjudicatory hearings for Jo.P. and Ja.P. occurred at a later date.

diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with BHS; comply with CEU; and visit as allowed by the court order. The SCP goal for the Children was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "p", filed 5/3/2023).

On December 23, 2020, an adjudicatory hearing was scheduled before the Honorable Vincent W. Furlong. The hearing was continued. The Court ordered the temporary commitment to stand; and the adjudication was deferred. The Court also ordered that Father was to be referred to BHS for consultation/evaluation forthwith. The Court ordered that CUA was to assist with obtaining appropriate bedding; was to conduct Pennsylvania State Police; Child Line; and Federal Bureau of Investigation (FBI) clearances on paternal aunt and uncle forthwith; and if cleared, Jo.P. and Ja.P. may be moved. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "q", filed 5/3/2023).

At the permanency review hearing held on January 14, 2021, the Court granted a continuance due to the unavailability of the hearing officer. The Court ordered that A.G. was to remain committed and placed. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "r", filed 5/3/2023).

On February 10, 2021, an adjudicatory hearing was scheduled before the Honorable Vincent W. Furlong. The hearing was continued due to no Judge sitting. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "s", filed 5/3/2023).

On March 30, 2021, an adjudicatory hearing was held for Jo.P. and Ja.P. The Honorable Vincent W. Furlong adjudicated the Children dependent and found that they were without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. The Court ordered the temporary commitment discharged and that the Children be fully committed to DHS. The Court further ordered that CUA/DHS was to make retroactive kinship payments to paternal aunt and uncle to the date of placement. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "t", filed 5/3/2023).

At the permanency review hearing on March 31, 2021, the Court ordered that A.G. remain as committed and placed; that Mother was to have two hour supervised community visits; and visitation may have been modified by the agreement of the parties. The Court further ordered that Mother was to be referred to CEU for a forthwith drug screen and random drugs screens prior to the next court date; was to be referred to a private facility for random drug screens if CUA could not send Mother; and was to be rereferred to ARC. The Court also ordered that CUA was to follow up with a housing referral for Mother; CUA was to assist Mother with transportation if necessary; CUA was to continue to explore family members; and sibling's cases were to be linked for the next court date. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "u", filed 5/3/2023).

On June 1, 2021, the CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit

as allowed by the court order. The SCP goal for A.G. was reunification; and Jo.P. and Ja.P. was stabilization. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "v", filed 5/3/2023).

At the permanency review hearing held on August 4, 2021, the Court granted a continuance at the request of the Assistant City Solicitor so that the matter could be heard by a Judge. The Court ordered that all prior orders were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "w", filed 5/3/2023).

At the permanency review hearing on October 13, 2021, the Court found that no Family Finding Report was submitted as the assigned worker was no longer with CUA; and Jo.P. and Ja.P. had current Individual Education Plan's (IEP's). The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; that Mother's visitation with A.G., Jo.P. and Ja.P. were to remain as previously ordered; and Father was to have liberal supervised visits with Jo.P. and Ja.P. as arranged and supervised by the caregivers. The Court further ordered that Mother was to be referred to CEU for monitoring. The Court also ordered that Mother's drug and alcohol treatment program was to provide CUA with an updated treatment plan and progress notes prior to the next court date; CUA was to ensure sibling visits continued; CUA was to submit a Safety Affidavit within seven days; CUA was to update the Family Finding Report; and it was to be PACFile within ten days and ten days prior to the next court date. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "x", filed 5/3/2023).

On November 30, 2021, the CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI

documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was reunification; and Jo.P. and Ja.P. was stabilization. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "y", filed 5/3/2023).

At the permanency review hearing held on January 5, 2022, the Court granted a continuance at Father's counsel's request that the matter be heard by a Judge. The Court further ordered that CUA was to submit a Safety Affidavit within seven days; a Family Finding Report was to be PAC Filed ten days prior to the next court date; and all prior orders were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "z", filed 5/3/2023).

The Court granted Father's Counsel's request to continue the permanency review hearing scheduled for February 17, 2022. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "aa", filed 5/3/2023).

At the permanency review hearing on March 25, 2022, the Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; that Mother's visitation with A.G., Jo.P. and Ja.P. was to remain as previously ordered. The Court further ordered that Mother was to comply with SCP objectives; and was to enroll in a drug and alcohol treatment program. The Court also ordered that CUA was to explore sibling visits separate from Mother's; and CUA was to explore voluntary relinquishment of parental rights with Father. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "bb", filed 5/3/2023).

On May 10, 2022, CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI; cooperate with CUA; comply with ARC; and visit as allowed by

the court order. Father's objectives were to sign all necessary ROI; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was reunification; and Jo.P. and Ja.P. was stabilization. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "cc", filed 5/3/2023).

At the permanency review hearing held on June 22, 2022, the Court granted a continuance due to the unavailability of the Guardian Ad Litem (GAL) and Mother's counsel. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "dd", filed 5/3/2023).

At the permanency review hearing on August 18, 2022, the Court found that A.G. and Jo.P. had current IEPs; and Ja.P. received autism services. The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; that Mother's visitation with A.G., Jo.P. and Ja.P. was to be supervised at the agency; and Father's visits were modified to weekly supervised visits at the agency. The Court further ordered that CUA was to provide A.G., Jo.P. and Ja.P. with clothing vouchers; CUA was to re-refer kinship referral; CUA was to assist grandfather with alternative fingerprinting location; and the assistant city solicitor was to conduct a Parent Locator Search (PLS) for Mother. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "ee", filed 5/3/2023).

On October 31, 2022, CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment

program; and visit as allowed by the court order. The SCP goal for A.G. was adoption; and Jo.P. and Ja.P. was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "ff", filed 5/3/2023).

At the permanency review hearing on November 10, 2022, the Court found that Father was not compliant with the permanency plan. The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed. The Court further ordered that Mother was to be referred to CEU for one random drug screen prior to the next court date; was to attend drug and alcohol treatment; and was to continue attending therapy. The Court also ordered that CUA was to setup supervised visits with parents if appropriate; was to complete clothing inventory and provide a clothing voucher if necessary; CUA was to continue to make outreach to parents; and all prior orders regarding Mother were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "gg", filed 5/3/2023).

At the permanency review hearing on February 3, 2023, the Court found that Father was minimally compliant with the permanency plan. The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; Mother was to have supervised visits at the agency; and Father was to have weekly supervised visits at the agency with 24 hour confirmation. The Court further ordered that Mother was to be referred to CEU for a forthwith drug screen, dual diagnosis assessment, and three random drug screens prior to the next court date; Mother was to avail herself to CUA; Father was to be referred to BHS for a consultation/evaluation. The Court also ordered that CUA was to follow up with resource parent to coordinate Jo.P. and Ja.P.'s autism evaluations; Ja.P. was to be referred to BHS for a psychological evaluation and medication management if appropriate, forthwith; CUA was to obtain consents for Ja.P.'s required treatment; and PLS was to

be conducted on Mother. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "hh", filed 5/3/2023).

On April 18, 2023, the CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was adoption; and Jo.P. and Ja.P. was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "ii", filed 5/3/2023).

Reunification with Mother is not a viable permanency option as she has failed to comply with her parental objective. Mother has failed to consistently attend the children's court hearings. Mother has failed to consistently visit, plan for, or provide financial support for her children throughout their time in placement. The conditions that necessitated Jo.P.'s and Ja.P.'s placement continue to exist and are not likely to be remedied in a reasonable time.

Reunification with Father is not a viable permanency option as he has failed to comply with his parental objective. _Father_ has failed to attend the child's court hearings. _Father_ has failed to visit, plan for, or provide financial support for his children throughout their time in placement. The conditions that necessitated Jo.P. and Ja.P.'s placement continue to exist and are not likely to be remedied in a reasonable time.

It is in Jo.P. and Ja.P.'s best interest to terminate the parental rights of Mother and Father so that Jo.P. and Ja.P. may be free for adoption.

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate court is limited to determining whether the decision of the trial court is supported by competent evidence. *See In re K.C.W.*, 689 A.2d 294, 298 (Pa. Super. 1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference it would give to a jury verdict. *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793, 800 (1996). The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511(a) in order to affirm a termination of parental rights. *In re D.A.T.*, 91 A.3d 197 (Pa. Super. 2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. Appellate courts have expressed their deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *In re T.S.M.*, 71 A.3d 251 (Pa. 2013). *In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. 2015).

The Children was adjudicated dependent on March 30, 2021. The record and testimony presented at the Termination Hearing demonstrated Mother's inability to remedy the conditions that brought the Children into care.

The trial court noted that the Children are placed in foster care with a supportive caregiver. The trial court found that the testimony and evidence indicated that the Children and their caregiver share a parental bond, and the care giver is providing for the Child's daily emotional and physical needs. In contrast, the trial court found that Mother and Father lacked the capacity and understanding to address their Children's basic emotional and physical needs. Consequently, documents and testimony presented at the termination hearing provided the trial court clear and convincing evidence to terminate Mother's and Father's parental rights and rule that the termination of these rights would be in the best interests of the Child pursuant to 23 Pa. C.S.A. §§2511(a)(1)(2)(5)(8)[2] and 23 Pa.C.S.A. § 2511(b)[3].

---

[2] (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

[3] (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental Factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

On July 6, 2023, this Court began hearing testimony regarding a petition to terminate Mother's and Father's parental rights.[4] This petition was filed over one year prior to the date of the hearing. Testimony was also taken on November 2, 2023 and the court announced its decision on that date.

The court heard testimony from the CUA case manager on both dates of the hearing. Father appeared for the July 6, 2023 hearing but failed to appear for the November 2, 2023 hearing despite being well aware that it was scheduled and that his parental rights were at stake. Mother failed to appear for both dates of the hearing. The record and testimony presented at the Termination Hearing demonstrated Mother's and Father's ongoing inability to provide care for or control of their Children. Their failure to remedy the conditions that brought the Children into care indicated a continuing disregard of their parental duties.

Silvine Belzince testified that she is employed at CUA NET Community Care as a case manager and that she has supervised this case since its inception over three years ago. She testified that this case came into care due to a lack of parental supervision, inadequate housing, and drug and alcohol concerns. The Children resided with Mother at the time they came into care. The Children have never resided with Father. The Children are currently placed with their paternal uncle and aunt (N.T. July 6, 2023, Volume 1, Page 11 to 13).

Father has not cooperated with CUA throughout the history of this case. He expended most of his energy fighting with Ms. Belzince, his attorney, and the Court rather than making a legitimate effort to achieve his SCP objectives and reunification with his children. Father's SCP objectives largely remained the same for the duration of this case. Specifically, he was ordered to avail himself to Ms. Belzince on a bi-weekly basis, sign all necessary consent documents, attend

---

[4] As the termination of Father's parental rights is the only issue before the Superior Court, there will be no analysis of the termination of Mother's parental rights in this Opinion.

court ordered visitation with the Children, obtain stable housing, and comply with mental health treatment at the Wedge. More recently, Father was ordered to enroll in drug and alcohol treatment and anger management counseling. (N.T. July 6, 2023, Volume 1, Page 15). Father exhibited none to minimal compliance with these objectives. (N.T. July 6, 2023, Volume 1, Page 28 to 29).

Father was ordered to sign documents granting agencies and service providers permission to share information with CUA so that CUA and the Court could better monitor Father's progress, or lack thereof, in achieving his SCP objectives. Father refused to perform this very simple, but highly important, task. He would not even sign a document acknowledging receipt of his SCP objectives. (N.T. July 6, 2023, Volume 1, Page 16).

Father was ordered to obtain suitable and stable housing. It was not until the hearing before the termination proceeding that he finally informed Ms. Belzince that he had located housing. Father did not provide her with a copy of the lease or with bills for utilities or other mail as proof that he resided there. She noted that Father resided with his Mother for a period of time but that he was not able to stay there any longer as his mother obtained a protection from abuse (PFA) order against him. (N.T. July 6, 2023, Volume 1, Page 17 and 18).

Father was attending mental health treatment at the Wedge prior to the Children coming into care. Ms. Belzince has not been able to confirm whether Father still attends mental health treatment as has been ordered, since Father refused to sign a consent giving CUA the authority to receive information regarding his mental health treatment. (N.T. July 6, 2023, Volume 1, Page 18).

Ms. Belzince testified that she referred Father to drug and alcohol treatment at the NET in March or April of last year. She noted that he tested negative for drugs but that there was concern the test was tampered with. She informed the Court that Father did not continue with the treatment and that she did not have further information as, once again, Father refused to sign a document

granting consent for the treatment provider to share information with CUA. This is the same reason that CUA was unable to receive copies of any drug screens that were performed at the NET even though they were ordered by the Court. (N.T. July 6, 2023, Volume 1, Page 19 to 23)

Ms. Belzince noticed a change in Father's demeanor "after COVID" and following a period during which he was incarcerated. (N.T. July 6, 2023, Volume 1, Page 27). She observed that his behavior had become more aggressive and because of this asked the Court to order that he attend anger management counseling. The Court agreed and Father was ordered to attend the program. CUA was unable to provide any proof of completion or attendance notes regarding Father's progress or participation in the program. Father claimed he was told that the program was full while the program reported they had availability for him. (N.T. July 6, 2023, Volume 1, Page 11 to 13).

Father's visits with children were problematic and concerning. Ms. Belzince testified that there has never been a time when Father was permitted to visit with the Children alone. She did note that there was a time when he was permitted to visit with the Children at the caregiver's home but that the visits were later moved back to the agency because there was concern that Father would present himself for the visits while under the influence. Ms. Belzince testified that the Children display fear when they are around Father. She noted that Father has anger issues that he does not manage well and that she has concern with his drug, alcohol, and mental health issues. She also testified that Father does not appear to possess enough patience when he is interacting with the children. (N.T. July 6, 2023, Volume 1, Pages 44 to 46).

The Court noted that Ms. Belzince appeared to exert significant effort in attempting to help Father but those efforts were stymied by Father's poor attitude and unreasonableness. Ms. Belzince testified that she rates Father's compliance with his SCP objectives as none to minimal.

The only reason she considered upgrading his efforts to minimal is because he recently *claimed* he had acquired housing. She justified her dismal assessment of his level of compliance by noting he has never availed himself to CUA, he will not sign necessary documents including consent forms, he will not follow Court orders, and he is not compliant with treatment. (N.T. July 6, 2023, Volume 1, Page 28 and 29).

Both Children reside with their paternal uncle and aunt. The children are twins and have resided in the caregiver's home for over two years. (N.T. November 2, 2023, Volume 1, Page 33). Ms. Belzince noted that Jo.P. is doing extremely well in the home. She noted that there are currently no behavior concerns for Jo.P. She stated that he is doing well in school and there are no concerns with his grades or attendance. The caregiver has ensured that Jo.P. is up to date with all his medical appointments. She described the relationship Jo.P. has with his caregivers as loving. He refers to his aunt as "mom" and his paternal uncle as "uncle" because Father has corrected him on their actual relationship. Jo.P. looks to his caregivers for all of his needs. She testified that when she speaks to Jo.P., he does not ask about Father or Mother and has had no recent contact with either. She described a time when she was visiting with the Children in the caregiver's home and Father called the residence and Jo.P. ran and hid and told his caregiver to tell Father that he was not home. Ms. Belzince asked Jo.P. why he did not want to talk to Father and the Child said that Father always screams at him and tells him what to do. He said that he does not want to speak to Father. (N.T. November 2, 2023, Volume 1, Pages 34 to 37). Ms. Belzince's own observations of Father during visits with the Children at the agency corroborate Jo.P.'s sentiments. She noted that the most recent visits were "an unfriendly environment" for the Children. She stated that during the visits Father was hostile and screaming. She also discussed

past visits in which Mother and Father left the Children alone in the visiting room and Father did use "physical contact" with both children. (N.T. November 2, 2023, Volume 1, Page 53).

Ja.P. has been diagnosed with autism and attends an elementary school that specializes in educating autistic children. He also attends the Center for Autism every three months. He does exhibit some behavioral issues at school but not in the caregiver's home. He is up to date with his medical appointments. Ms. Belzince testified that Ja.P. shares a parent-child relationship with the caregivers. She noted that his aunt (who is one of his caregivers) is a special education teacher and is very patient with him. She stated that the family uses communication devices so that he can better communicate with them in the home. She testified that Ja.P. looks to his current caregivers for all his needs and that Ja.P. does not share any bond at all with Father. (N.T. November 2, 2023, Volume 1, Page 40 to 45). She noted that Ja.P. appeared scared of Father during one of their most recent visits. (N.T. November 2, 2023, Volume 1, Page 57 to 58).

Ms. Belzince testified that Father has never reached out to her to inquire how the Children were doing in the caregiver's home. He has never inquired about his sons' medical or educational needs. He has never sent a gift for his them on their birthday or on holidays. She testified that neither Child shares a parent-child bond with Father. She noted that the bond they share with their current caregivers is that of a parent and child. She stated that she does not believe that the Children would suffer any irreparable harm if Father's parental rights were terminated.

Lisa Visco, Esquire, termination of parental rights counsel, issued her report to the Court. She stated that she visited the Children in the home of the caregivers. She noted that the Children want to continue living there and be adopted by them. They do not want to have visits with Mother or Father. (N.T. November 2, 2023, Volume 1, Page 58 to 59).

It was clear to the trial court from the testimony that a parent/child bond existed between the Children and their current caregivers. The testimony of Ms. Belzince was deemed to be credible and accorded great weight. The court was perplexed by Father's lack of cooperation with CUA in even the simplest matters, such as signing consents. Had Father devoted a fraction of the effort he expended in being obstreperous and contrarian with CUA toward achieving his SCP objectives, he may not be situated in his current posture. Father's inability, or unwillingness, to accomplish all his SCP objectives throughout the history of the case proved to the trial court that the conditions which brought the Children into care had not been remedied.

## CONCLUSION

Based upon the testimony at the Termination of Parental Rights Hearing as well as the documents in evidence, the trial court finds that clear and convincing evidence existed to terminate Father's parental rights pursuant to 23 Pa. C.S. 2511(a)(1) (2)(5) and (8). The trial court further finds that pursuant to 23 Pa. C.S. 2511(b), the termination of Father's parental rights would not have a detrimental effect on the Children and that it was in the Children's best interests. For the foregoing reasons, this trial court respectfully requests that the Order terminating Father parental rights be AFFIRMED.

**BY THE COURT**

Date: 2|13|24

JOHN P. SABATINA, JR., J.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above-captioned Opinion was filed on

the undersigned date in the Court of Common Pleas of Philadelphia County Family Court Division

and served by first class mail upon the following:

Jacqueline Coelho, Esquire
Philadelphia Law Department
One Parkway
1515 Arch Street-16th Floor
Philadelphia, PA 19102
Attorney for DHS

James Martin, Esquire
1800 John F. Kennedy Boulevard, Suite 300
Philadelphia, PA 19103

Lisa Visco, Esquire
723 Lombard St.
Philadelphia, PA 19147

Andre Martino, Esquire
7435 Sprague Street
Philadelphia, PA 19119

Gary Server, Esquire
52103 Delaire Landing
Philadelphia, PA 19114

Date: 2\13\24

JOHN P. SABATINA, JR., J.